UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:  Request from the United Kingdom
Pursuant to the Treaty Between the United
States of America and the Government of the
United Kingdom of Great Britain and Northern          Case No. _____
Ireland on Mutual Legal Assistance in
Criminal Matters in the Matter of Easier, PLC
_____

### APPLICATION FOR ORDER PURSUANT TO THE TREATY
### ON MUTUAL ASSISTANCE IN CRIMINAL MATTERS AND 28 U.S.C. §1782

The United States of America, by and through the undersigned Assistant United

States Attorney, petitions this Court for an Order, pursuant to Article 1 of the Treaty

Between the United States of America and the Government of the United Kingdom of

Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters, in

force December 2, 1996, Treaty Doc. 104-2, 1994 WL 855115 (copy attached), 28

U.S.C. §1782, and its own inherent authority, appointing Arnold B. Corsmeier, Assistant

United States Attorney, as Commissioner to collect evidence from witnesses within the

jurisdiction of this Court and to take such other action as is required to execute the

attached request from the United Kingdom made pursuant to the Treaty.

MEMORANDUM OF LAW

The Treaty with the United Kingdom obligates the United States, and empowers

this Court, to provide assistance to the United Kingdom in criminal matters.  This Court

is also empowered to provide assistance by the federal statute governing the provision

of assistance in foreign judicial proceedings generally, 28 U.S.C. §1782, and by its own

inherent authority.  See, e.g., In re Letter Rogatory from the Justice Court, District of

Montreal, Canada, 523 F.2d 562 (6th Cir. 1975).  A treaty constitutes the law of the land.

U.S. Const. art. VI.  The provisions of a treaty have equal footing with acts of Congress

and are binding on the courts.  Asakura v. City of Seattle, 265 U.S. 332, 341 (1924);

United States v. The Peggy, 5 U.S. 103 (1801).  To the extent that the provisions of a

treaty are inconsistent with a preexisting statutory provision, the treaty supersedes the

statute.  Zschernig, et al. v. Miller, Administrator, et al., 389 U.S. 429, 440-441 (1968);

In re Commissioner's Subpoenas, 325 F.3d 1287, 1305-1306 (11th Cir. 2003); United

States v. Erato, 2 F.3d 11, 15-16 (2d Cir. 1993).

   The United States and the United Kingdom entered into the Treaty for the

purpose of improving  "the effectiveness of law enforcement authorities in both

countries . . . through cooperation and mutual legal assistance in criminal matters . . . ."

Preamble to the Treaty.  The Treaty obliges each party to provide assistance to the

other in connection with the investigation and prosecution of criminal offenses, and in

proceedings related to criminal matters.  Articles 1 and 19(1).  The assistance shall

include taking testimony or statements of persons, providing documents, records,  and

evidence, serving documents, locating and identifying persons, transferring persons in

custody for testimony or other purposes, executing requests for searches and seizures,

identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of

crime and assistance in related proceedings, and such other assistance as may be

agreed between Central Authorities.  Article 1(2).  See Barr v. U. S. Department of

Justice, 645 F. Supp. 235, 237 (E.D.N.Y. 1986), aff'd, 819 F.2d 25 (2d Cir. 1987).

   The Treaty empowers federal district courts to execute treaty requests in order to

comply with the United States' treaty obligation.  Article 5 provides that:

2

(1)  As empowered by this Treaty or by national law, or in accordance with its national practice, the Requested Party shall take whatever steps it deems necessary to give effect to requests received from the Requesting Party.  The courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

. . .

(3) The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party.

The Treaty contemplates that federal district courts will use compulsory measures to execute such requests.  Article 8(1) provides that:

A person in the territory of the Requested Party from whom evidence is requested pursuant to this Treaty may be compelled, if necessary, to appear in order to testify or produce documents, records, or articles of evidence by subpoena or such other method as may be permitted under the law of the Requested Party.

The Treaty requires the two states to provide assistance to each other in investigations and court proceedings covered by the Treaty.  However, were no treaty in force, a federal district court would nonetheless be empowered, within its discretion, to order the production of evidence under 28 U.S.C. §1782, the statute governing the provision of assistance in foreign judicial proceedings generally.  Under Section 1782, any interested person, whether a foreign country, a foreign judicial authority, or a litigant in a foreign court, may seek assistance regardless of the availability of reciprocal assistance from the foreign jurisdiction.  S. Rep. No. 1580, 88th Cong., 2d Sess. 1, reprinted in 1964 U.S. Code Cong. & Admin. News 3872.

The Treaty imposes no dual criminality requirement as a precondition for providing assistance.  Consequently, each state is obligated to provide assistance without regard to whether the conduct under investigation or prosecution would

constitute an offence under the laws of the Requested State.  See Letter of Submittal of

Treaty to the President from the Department of State, January 6, 1995.

The Treaty is designed to be self-executing and does not require implementing

legislation.  Letter of Submittal of the Treaty to the President from the Department of

State, January 6, 1995.  As such, it utilizes the existing authority of the federal courts,

particularly 28 U.S.C. §1782.  Pursuant to Section 1782, a court may appoint a

Commissioner to gather evidence on behalf of the court and to submit the evidence,

through appropriate channels, to the requesting nation.  Consequently, federal district

courts routinely utilize the "commission" procedure authorized by 28 U.S.C. §1782 as

the "procedural vehicle" to fulfill their judicial responsibility under the Treaty of executing

such requests.  In re Commissioner's Subpoenas, 325 F.3d 1287, 1305-06 (11th Cir.

2003).

Section 1782 further provides: "To the extent that the order does not prescribe

otherwise, the testimony or statement shall be taken, and the document or other thing

produced, in accordance with the Federal Rules of Civil Procedure."    A federal district

court empowers a commissioner to collect the evidence using the procedure prescribed

by the court.  A court has "complete discretion in prescribing the procedure to be

followed."  Sen. Rep. No. 1580, 88th Cong., 2d Sess. 1 (1964), reprinted in 1964 U.S.

Code Cong. & Admin. News 3782, 3789.  When a court's order fails to specify a

procedure by which a commissioner is to collect the evidence, the Federal Rules of Civil

Procedure apply.  In re Letters Rogatory from the Tokyo District Prosecutor's Office,

Tokyo, Japan, 16 F.3d 1016, 1019 (9th Cir. 1994); In re Letter of Request from the

Supreme Court of Hong Kong, 138 F.R.D. 27, 31 (S.D.N.Y. 1991).  However, as

Section 1782 makes clear, when a court does specify a procedure other than the

Federal Rules of Civil Procedure, the alternative procedure shall apply.  28 U.S.C.

§1782(a); Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1098 (2d Cir. 1995).  In

executing a request made pursuant to a treaty, a court has the obligation to prescribe

effective and expeditious procedures designed to promote the purpose of the treaty.

See In re Commissioner's Subpoenas, 325 F.3d 1287, 1305 (11th Cir. 2003).

Article 5(2) of the Treaty provides for the issuance of procedural documents,

such as subpoenas, to effectuate the gathering of evidence, as follows:

> When execution of the request requires judicial or administrative action,
> the request shall be presented to the appropriate authority by the persons
> appointed by the Central Authority of the Requested Party.

Thus, the commissioner has the power to receive the testimony or statements of

witnesses and the production of documents or other things, and the court may

prescribe the practice and procedure for taking testimony or statements or producing

documents or other things.  One such procedure may be the use of the attached form,

entitled Commissioner's Subpoena, to obtain the requested evidence.  See In re

Commissioner's Subpoenas, 325 F.3d 1287, 1291 (11th Cir. 2003) (incorporating in

pertinent part the district court's order directing the use of commissioner's subpoenas);

United States v. Erato, 2 F.3d 11, 13-14 (2d Cir. 1993) (incorporating in pertinent part

the district court's order directing the use of commissioner's subpoenas).  The

commissioner's subpoena is a creation of neither the Federal Rules of Criminal

Procedure nor the Federal Rules of Civil Procedure, but is an order of the court for the

production of evidence in accordance with both Article 25(4) of the Treaty and Section

1782.  See 28 U.S.C. §1651; White v. National Football League, 41 F.3d 402, 409 (8th

5

Cir. 1994) (a court may issue whatever process it deems necessary to facilitate disposition of the matter before it).

In addition, it is customary that requests for international legal assistance in criminal matters be executed without notification, by the requested state, to the target of a foreign criminal investigation or a foreign criminal defendant, unless a contrary intention is apparent from the nature or content of the request.  Accordingly, a federal district court should authorize a commissioner to collect the evidence requested without notice to any party other than the recipient of the commissioner's subpoena.  To the extent that execution of a request entails the production of bank or financial records otherwise covered by the Right to Financial Privacy Act, 12 U.S.C. §§3401 et seq., the commissioner need not give, or arrange for the custodian of records to give, notice to an account holder inasmuch as the Act does not apply in the execution of foreign legal assistance requests.  Young v. U.S. Dept. of Justice, 882 F.2d 633, 639 (2d Cir. 1989); In re Letter of Request for Judicial Assistance from the Tribunal Civil De Port-Au-Prince, Republic of Haiti, 669 F. Supp. 403, 407 (S.D. Fla. 1987); In re Letters of Request from the Supreme Court of Hong Kong, 821 F. Supp. 204, 211 (S.D.N.Y. 1993).  For these reasons, it is requested that this Court authorize the use of commissioner's subpoenas and prescribe that the execution of the request proceed without notice to the targets or defendants in the foreign criminal proceedings.

A court, in keeping with its obligation to design effective and expeditious procedures to promote the purpose of the Treaty, may authorize service of commissioner's subpoenas anywhere within the territory of the United States (i.e., coextensive with the service of subpoenas in U.S. criminal investigations and

prosecutions pursuant to Rule 17, Federal Rules of Criminal Procedure).  The Section 1782 limitation on the court's power to compel to "the district in which a person resides or is found" is inoperative in executing a treaty request.  In re Commissioner's Subpoenas, 325 F.3d 1287, 1305-1306 (11th Cir. 2003).

As the attached request reflects, the request has been made by the Serious Fraud Office of the United Kingdom as part of the investigation of Easier, PLC, and its principals for the offenses of conspiracy to defraud and theft, in violation of the Common Law of England and Wales.  Among other things, the United Kingdom has asked the United States to request that a designated officer of SouthTrust Bank (now Wachovia) in Palm Coast, in the Middle District of Florida, produce copies of all account opening forms, bank statements, paid checks, deposit slips, credit vouchers, telegraphic (wire) transfers, SWIFT transfers, records of interaccount transfers, records of payments to any other account or bank, safe custody account records, signature cards and references, customer information records and notes, bank managers' notes, and any other correspondence or documents relating to any account held by Maxima Investment Fund LLP with the bank from January 1, 2003, to the present.

In accordance with the request of the United Kingdom, the government moves this Court to issue the attached Order appointing Assistant United States Attorney Arnold B. Corsmeier as Commissioner and authorizing him to take the actions necessary, including the issuance of Commissioner's Subpoenas, to obtain the evidence requested, and to adopt such procedures in receipt of the evidence as are consistent with the intended use thereof in the United Kingdom.

Dated this 25th day of October, 2007.

Respectfully submitted,

JAMES R. KLINDT
United States Attorney

By: _____
ARNOLD B. CORSMEIER
Assistant United States Attorney
Florida Bar No.  0869139
300 North Hogan Street, Suite 700
Jacksonville, Florida  32202-4270
Telephone:   (904) 301-6300
Facsimile:    (904) 301-6310
E-mail:       chip.corsmeier@usdoj.gov

8



## Home Office

**Crime Reduction and Community Safety Group**
United Kingdom Central Authority
5th Floor, Fry Building, 2 Marsham Street, LONDON SW1P 4DF
Switchboard 0870 0001585  Fax 0207 035 6987  Direct Line 020 7035 1282
E-mail @homeoffice.gsi.gov.uk  www.homeoffice.gov.uk

US Department of Justice
1 202 514 0000
Office of International Affairs
Criminal Division
1301 New York Avenue, N.W.
8th Floor, Bond Building
WASHINGTON DC 20005

| | |
|---|---|
| Our Ref | MLO 06/221/0106 |
| Your Ref | |
| Date | 8 February 2006 |

Dear/Madam

### REQUEST FOR LEGAL ASSISTANCE IN AN INVESTIGATION ON: EASIER PLC

Please find enclosed with this letter a request issued by the Serious Fraud Office I should be grateful if you would pass it to the appropriate government to arrange for the request to be executed.

This requests is made under our Mutual Legal Assistance Treaty (MLAT) between the United Kingdom of Great Britain and Northern Ireland and United States of America 1994

Any evidence obtained may be handed to the visiting British Officers or can be returned via diplomatic channels. Under Section 9(2) of the Crime (International Co-operation) Act 2003, the evidence obtained as a result of this letter of request cannot be used, without your consent, for any other purpose than that specified in the request."

I would be grateful if you could acknowledge receipt of this request either by, email, fax or mail as you deem appropriate. I look forward to hearing from you soon.

Yours faithfully

Ms B Adegbenro
United Kingdom Central Authority
For and on behalf of the Secretary of State

06 FEB 21 PM 3: 05

OFFICE OF INT'L AFFAIRS
RECEIVED

182-23404

G:\My Documents\Legal Assistance
letter-OSA.doc

# Serious Fraud Office



**Director: Robert Wardle**

Elm House  10-16 Elm Street  London WC1X 0BJ
Email:  Christopher.brown@sfo.gsi.gov.uk

The Competent Judicial Authorities
of the United States of America.

Office of International Affairs.

Washington.

| | |
|---|---|
| **Direct Tel:** | **+44 (0)20 7239 7041** |
| **Direct Fax:** | **+44(0)20 7833 5450** |
| **Our ref** | **ESR/D/CB** |

**Date:  2    February 2006**

Dear Sir,

**REQUEST FOR ASSISTANCE UNDER THE PROVISIONS OF THE TREATY OF MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS 1994 BETWEEN THE UNITED STATES OF AMERICA AND THE UNITED KINGDOM.**

**RE: EASIER PLC.**

**BRIAN COPSEY, SIMON EAGLE, DAVID GOUGH AND GRAHAM MAY.**

The Director of the Serious Fraud Office presents his compliments to the Competent Judicial Authorities of the United States of America and has the honour to inform them of the following facts and to submit this request for assistance in relation to a criminal investigation being carried on by the Serious Fraud Office ("SFO") and the City of London Police.

The SFO was created by the Criminal Justice Act 1987 (the "CJA 1987") and came into being on 6 April 1988. Under the CJA 1987, the Director of the SFO (the "Director") may investigate and, if necessary, institute criminal proceedings in respect of suspected offences in England, Wales and Northern Ireland which appear to him, on reasonable grounds, to involve serious or complex fraud. The Director discharges his functions under the superintendence of the Attorney General for England and Wales. The Director is also empowered by statute to issue letters of request.

Designated lawyers in the SFO have all the powers of the Director as to the investigation and prosecution of serious or complex fraud. The signatory to this letter is one of the lawyers so designated and is empowered to issue this request for assistance.



## Persons under investigation.

**1. Brian Mawson Copsey,**

Flat 25 Bryanston Court,
George Street,
London
W1H 7HA.

Date of birth:  20/1/54

Nationality: New Zealander.

**2. Simon Peter Eagle.**

The Rick
South End
Much Hadham
Hertfordshire
SG10 6EP

Date of birth:  16/08/1958

Nationality: British.

**3. David Wyndham Gough.**

35 Hurlingham Square
Peterborough Road
London
SW6 3DZ.

Date of birth:  13/11/1928

Nationality: British.

**4. Graham Philip May.**

13 Penningtons,
Bishop Stortford,
Herts
CM23 4LE.

Date of birth. 18.2.55.

Nationality: British.



## Offences.

There is reasonable cause to believe that the above named have committed offences of conspiracy to defraud and theft. Conspiracy to Defraud is an offence contrary to the Common Law of England and Wales.  The offence comprises an agreement between two or more persons to act dishonestly so as to prejudice or to take the risk of prejudicing another's rights (usually their economic interests), knowing that those in agreement have no right to do so.  Common Law is the ancient unwritten Law of England and Wales as handed down in the decisions of the judges.  The offence is only triable on indictment by a judge and jury.  By Section 12 of the Criminal Justice Act 1987, the offence is punishable by a maximum term of 10 years imprisonment.

Theft is an offence contrary to Section 1 of the Theft Act 1968.  The offence is triable on indictment by a judge and jury.  The offence is punishable by a maximum term of 7 years imprisonment

Copies of the relevant statutory provisions are attached hereto as "Annex A".

## Summary of Facts.

The Serious Fraud Office and the City of London Police are carrying out an investigation into the affairs of Easier plc ("Easier").

The suspects hold the following positions with Easier:-

      (1) David Gough - Non-executive chairman
      (2) Simon Eagle - Director (resigned 21 July 2004).
      (3) Brian Copsey - General Manager.
      (4) Graham May - Company Secretary.

Easier plc was formed in November 1999 with the intention of establishing an internet service to enable people to buy and sell homes on-line.

Easier was floated as a new start company on 4th February 2000 via a placing of £12 million on the Alternative Investment Market ("AIM").

Disappointing revenues contributed to the collapse of its share price and the business was put up for sale in November 2000. No buyer was found and it ceased trading in February 2001.

On the 30th June 2004 Easier made a regulatory announcement that it intended to invest in the property sector. The first stage in this new strategy was the entering into of a conditional agreement to acquire the whole of the issued share capital of Onslow Ditchling Company (ODL). Their nominated advisers were Beaumont Cornish Ltd. Deloitte Touche were the company's auditors

Beaumont Cornish originally understood that Easier was a cash shell with £5m. A balance of £4.5m was confirmed by the company in mid July 2004. By September 2004



the true position appears to be that Easier had only £2m at its disposal with the remainder allegedly invested in a number of "special situation" stocks.

This matter was referred to the SFO by the AIM Regulation Section of the London Stock Exchange in December 2004. This followed a report from Beaumont Cornish that Easier had failed to produce any conclusive proof of payment for or ownership of the "special situation stocks" leading to a suspicion that company funds may have been misappropriated.

Between 11th November 2003 to 21st July 2004 Simon Eagle was a non executive director of Easier. He is currently under investigation by the Financial Services Authority in connection with his ownership and operation of a stock broking firm SP Bell.

On 28th October 2003 Easier paid £1m to SP Bell. £800,000 was then transferred by SP Bell to Pershing Securities. The reference given by SP Bell for this transaction is RA 30536.This reference relates to an SP Bell client Winterway Investment Corp which is owned by Simon Eagle. On 23rd October 2003 SP Bell had written to Mr Eagle at Winterway Investment Corp advising that his account was in debit in the sum of £753,778.00 and asking for a cheque payable to Pershing Securities Ltd to be forwarded by return of post. Information provided by Pershing confirms that the funds from Easier have been used to clear Eagle's indebtedness to Pershing which relates to a purchase of 3 million Easier shares. Eagle subsequently sold the Easier shares for £596,972 with the bulk of the funds being paid to The Viburna Corp, a company owned by Eagle.

During the course of its dealings with its professional advisers representatives of Easier have produced various documents to their professional advisers in an effort to convince them that the £1m payment to SP Bell was used to purchase shares in the following companies on behalf of Easier:-

    1. **Apogee Technology Inc** ("Apogee") 129 Morgan Drive Norwood MA 02062. Apogee stock is quoted on the American stock Excahnge under the symbol ATA.

    2. **Duravest Inc** ("Duravest") 1543 Bayview Avenue Suite 409 Toronto Ontario. Duravest stock is quoted on the OTC Bulletin Board under the symbol DUVT.

Examples of the documents produced to Easier professional advisers are as follows:-

    (a) A copy of a statement from the Leadenhall Bank and Trust Limited, One Montague Place P.O. Box N -1965, Nassau, as proof that Easier had paid US$150,000 to Duravest and US$1m to Apogee in September 2003.

    (b) An agreement between Zeal Consultants Ltd and Easier dated 24th October 2003 relating to the purchase by Easier of 1,250,000 Duravest shares for £720,000 apparently signed by Gough.

    (c) Minutes of an Easier Board Meeting on 27th October 2003 attended by



Gough, Eagle, May and Copsey. These minutes contain the following entries:-

> "*After discussion in relation to the company's proposed investment purchases, **IT WAS RESOLVED** that the company purchase 1,250,000 ordinary shares in Duravest Inc at a price of £720,000.*"

> "***IT WAS FURTER (sic) RESOLVED** that the company purchase 50,000 ordinary shares in Apogee Technologies Inc at a price of £280,000.*"

(d) Copy letter on Easier plc headed paper dated 28th October 2003 addressed to Mr Simon Eagle, SP Bell apparently signed by Gough and Copsey as follows:-

> "*Dear Simon,*
>
> *As you aware Easier plc has today transferred £1,000,000 one million pounds) to your client account. On receipt of these funds please transfer £720,000 in respect of the purchase of 1,250,000 Duravest shares and £280,000-in respect of 50,000 apogee shares, the bank details you already have.*"

(e) A Declaration of Trust dated 3rd November 2003 in which Fulton confirm that they hold 50,000 Apogee shares on trust for Easier. The Deed also indicates that Easier can assign the declaration of Trust to Fulton in return for a payment of £280,000.

When interviewed following arrest Mr Copsey suggested that Apogee shares may have been obtained from an entity known as the Maxima Investment Fund. Both Mr Gough and Mr Copsey suggest in interview that, irrespective of what happened to the £1m originally supplied to Eagle, Apogee and Duravest shares to this value have been provided to Easier.

The SFO wish to establish the following from the Transfer Agents who serve Apogee and Duravest:-

(a) Whether Fulton Partners Ltd owned shares in Apogee and Duravest and if so the date of acquisition and details of subsequent disposals.

(b) Whether Zeal Consultants Ltd PO Box 560, 2nd Floor, The Beatrice Butterfield Buildings, Butterfield Square, Providenciales, Turks and Caicos owned Duravest shares and if so whether there is any record of the transfer of 1,250,000 shares to Easier or Fulton on or about 24th October 2003.

(c) Whether the Maxima Investment Fund held Apogee shares in or around October 2003 and if so whether there is any record of a transfer Easier or Fulton on or about 24th October 2003.

(d) Details of all acquisitions and transfers of Apogee and Duravest shares during the period September 2003 to July 2005.



If shares are held by nominees it would obviously be useful if details are provided of the beneficial owner if known.

The SFO also have a more general interest in the Maxima Investment Fund. From the £1m paid to SP Bell by Easier £115,473.44 was paid on 4 November 2003, according to the relevant bank statement, to 'Maxima Inv'. Easier's draft balance sheet suggests that the company has deposited the sum of £273,000 with Maxima Investment.

Amongst the paperwork in the possession of the SFO is a copy letter addressed to 'Brian Copsey General Partner Maxima Investment Fund'. The letter relates to a payment made by a Katherine Quinn to Maxima and contains details of the following bank account:-

**South Trust Bank**
**1050 Palm Coast Parkway South West**
**Palm Coast**
**Florida 32137**

**ABA NO 063 109 430**
**Account NBR 71 362 901**

**Account Name Maxima Investment Fund LLP**

*(Please note some of the numbers on the copy letter are difficult to read and the 6 in the account number may in fact be 0 or 8)*

Documents held by the South Trust bank should demonstrate the following:-

1. The degree of control exercised by Mr Copsey over the account,
2. Whether any other of the suspects are involved in the operation of the account and/or Maxima,
3. Any payment made by Maxima for the purchase of Apogee shares,
4. The extent to which Mr Copsey or the other suspects benefited personally from the payments made to Maxima by SP bell and Easier.

**Enquiries to be made.**

1. To request that a designated officer of

**Interwest Transfer Company,**
**1981 East 4800 South**
**Suite 100,**
**Salt Lake City,**
**Utah 4117**

produce copies of the following documents:-



(a) The shareholder list for Duravest for the period 1 September 2003 to 31 July 2005 including the details where known of the beneficial ownership of shares held by nominees.

(b) Details of the acquisition and disposal of Duravest shares by Fulton Partners Ltd up to 31 July 2005.

(c) Confirmation of the number of Duravest shares, if any, held by The Maxima Investment Fund as at 1st October 2003 and details of any subsequent transfer of Duravest shares by Maxima to Easier or Fulton.

2. To request that a designated officer of

**American Stock Transfer & Trust Company**
**59 Maiden Lane**
**New York, New York 10038**
**Tel (800) 937-5449**
**Tel (718) 921-8124**
**Fax (718) 236-2641**

produce copies of the following documents:-

(a) The shareholder list for Apogee for the period 1 September 2003 to 31 July 2005 including the details where known of the beneficial ownership of shares held by nominees.

(b) Details of the acquisition and disposal of Apogee shares by Fulton Partners Ltd up to 31 July 2005.

3. To request that a designated officer of the

**South Trust Bank,**
**1050 Palm Coast Parkway South West,**
**Palm Coast,**
**Florida 32137,**

produce copies of all account opening forms, bank statements, paid cheques, paying in slips, credit vouchers, telegraphic transfers, swift transfers, records of inter account transfers, records of payments out to any other account or bank, safe custody account records, signature cards and references, customer information records and notes, bank managers' notes, or any other correspondence or information with respect to any matter relevant to the investigation relating to any account held by Maxima Investment Fund LLP with the bank from 1 January 2003 to date.

**Admissibility of Evidence.**

Section 117 Criminal Justice Act 2003 deals with the admissibility into evidence of business records provided the following conditions are satisfied:-



(a) the document or the part containing the statement was created or received by a person in the course of a trade, business, profession or other occupation, or as the holder of a paid or unpaid office,

(b) the person who supplied the information contained in the statement (the relevant person) had or may reasonably be supposed to have had personal knowledge of the matters dealt with, and

(c) each person (if any) through whom the information was supplied from the relevant person to the person mentioned in paragraph (a) received the information in the course of a trade, business, profession or other occupation, or as the holder of a paid or unpaid office.

## Assistance required.

1. That the above enquiries are made. It is not perceived necessary for members of the SFO or City of London Police to be present when the enquiries are made unless this is required by or thought helpful by the US Authorities.

2. That such other enquiries are made, persons interviewed and exhibits secured as appear to be necessary in the course of the investigation.

3. That an indication be obtained of the preparedness of any witness to travel to the United Kingdom to give evidence in person. In the event of such a person being required their reasonable expenses will be paid.

4. That signed and certified copies of any statements made and any documents or other items secured during the course of the enquiries be permitted to transmitted to the United Kingdom for use in the criminal investigation and any ancillary criminal proceedings which may arise. It is further requested that all documentation be sent through diplomatic channels and marked for the attention of the author of this request.

## Restriction on use of evidence obtained under a Letter of Request.

Under Section 9(1) of the Crime (International Co-operation) Act 2003 evidence obtained from another jurisdiction by the use of a Letter of Request may not be used for any purpose other than that specified in the request.

The Director requests the provision of documents and evidence for the purposes of his investigations, for use as evidence in criminal proceedings and in any application to restrain the assets of a defendant or to confiscate such property in the event of a conviction.

The Director of the Serious Fraud Office thanks in advance the Competant Judicial Authorities of the United States of America and takes this opportunity of renewing to them the assurance of his highest consideration.

Page 9

Yours, faithfully,

**Christopher Brown**
**Case Controller.**



**Annex A**

**Conspiracy to Defraud.**

Common Law of England and Wales

Conspiracy to defraud is an offence against the common law of England and Wales. The offence consists of an agreement between two or more persons to carry out a dishonest course of conduct which would prejudice the rights of another person.

This offence carries a maximum sentence of 10 years imprisonment and/or a fine.

**Theft.**

SECTIONS 1 – 7 THEFT ACT, 1968

The Statutory Offence of theft is defined in Sections 1 to 6 of the Act.
Section 7 of the Act provides that a person guilty of theft shall be liable to imprisonment for a term not exceeding seven years.

Section 1.
(1)    A person is guilty of theft if he dishonestly appropriates property belonging to another with the intention of permanently depriving the other of it; and "thief" and "steal" shall be construed accordingly.

(2)    It is immaterial whether the appropriation is made with a view to gain, or is made for the thief's own benefit.

(3)    The five following sections of this Act shall have effect as regards the interpretation and operation of this section (and, except as otherwise provided by this Act, shall apply only for purposes of this section).

Section 2.
(1)    A person's appropriation of property belonging to another is not to be regarded as dishonest -

if he appropriates the property in the belief that he has in law the right to deprive the other of it, on behalf of himself or of a third person; or

if he appropriates the property in the belief that he would have the other's consent if the other knew of the appropriation and the circumstances of it; or

(except where the property came to him as trustee or personal representative) if he appropriates the property in the belief that the person to whom the property belongs cannot be discovered by taking reasonable steps.

(2)    A person's appropriation of property belonging to another may be dishonest notwithstanding that he is willing to pay for the property.



Section 3.
(1)     Any assumption by a person of the rights of an owner amounts to an
appropriation, and this includes, where he has come by the property (innocently or not)
without stealing it, any later assumption of a right to it by keeping or dealing with it as
owner.

(2)     Where property or a right or interest in property is or purports to be transferred
for value to a person acting in good faith, no later assumption by him of rights which he
believed himself to be acquiring shall, by reason of any defect in the transferor's title,
amount to theft of the property.

Section 4.
(1)     "Property" includes money and all other property, real or personal, including
things in action and other intangible property.

(2)     A person cannot steal land, or things forming part of land and severed from it by
him or by his directions, except in the following cases, that is to say -

when he is a trustee or personal representative, or is authorised by power of attorney, or
as liquidator of a company, or otherwise, to sell or dispose of land belonging to another,
and he appropriates the land or anything forming part of it by dealing with it in breach
of the confidence reposed in him; or
when he is not in possession of the land appropriates anything forming part of the land
by severing it or causing it to be severed, or after it has been severed; or
when, being in possession of the land under a tenancy, he appropriates the whole part of
any fixture or structure let to be used with the land.

For the purposes of this subsection "land" does not include incorporeal hereditament;
"tenancy" means a tenancy for years or any less period and includes an agreement for
such a tenancy, but a person who after the end of a tenancy remains in possession as
statutory tenant or otherwise is to be treated as having possession under the tenancy, and
"let" shall be construed accordingly.

(3)     A person who picks mushrooms growing wild on any land, or who picks
flowers, fruit or foliage from a plant growing wild on any land, does not (although not
in possession of the land) steal what he picks, unless he does it for reward or for sale or
other commercial purpose.

For purposes of this subsection mushroom includes any fungus, and "plant" includes
any shrub or tree.

(4)     Wild creatures, tamed or untamed, shall be regarded as property; but a person
cannot steal a wild creature not tamed nor ordinarily kept in captivity, or the carcase of
any such creature, unless either it has been reduced into possession by or on behalf of
another person and possession of it has not since been lost or abandoned, or another
person is in course of reducing it into possession.

Section 5
(1)     Property shall be regarded as belonging to any person having possession or



control of it, or having in it any proprietary right or interest (not being an equitable interest arising only from an agreement to transfer or grant an interest).

(2)     Where property is subject to a trust, the person to whom it belongs shall be regarded as including any person having a right to enforce the trust, and an intention to defeat the trust shall be regarded accordingly as an intention to deprive of the property any person having that right.

(3)     Where a person received property from or on account of another, and is under an obligation to the other to retain and deal with that property or its proceeds in a particular way, the property or proceeds shall be regarded (as against him) as belonging to the other.

(4)     Where a person gets property by another's mistake, and is under obligation to make restoration (in whole or in part) of the property or its proceeds or of the value thereof, then to the extent of that obligation the property or proceeds shall be regarded (as against him) as belonging to the person entitled to restoration, and an intention not to make restoration shall be regarded accordingly as an intention to deprive that person of the property or proceeds.

(5)     Property of a corporation sole shall be regarded as belonging to the corporation notwithstanding a vacancy in the corporation.

Section 6
(1)     A person appropriating property belonging to another without meaning the other permanently to lose the thing itself is nevertheless to be regarded as having the intention of permanently depriving the other of it if his intention is to treat the thing as his own to dispose of regardless of the other's rights; and a borrowing or lending of it may amount to so treating it if, but only if, the borrowing or lending is for a period and in circumstances making it equivalent to an outright taking or disposal.

(2)     Without prejudice to the generality of subsection (1) above, where a person having possession or control (lawfully or not) of property belonging to another, parts with the property under a condition as to its return which he may not be able to perform, this (if done for purposes of his own and without the other's authority) amounts to treating the Property as his own to dispose of regardless of the other's rights.

Section 7. as amended by the Criminal Justice Act 1991, S.26.  A person guilty of theft shall on conviction on Indictment be liable to imprisonment for a term not exceeding seven years.

There is no time limit on the institution of proceedings by the Crown for the Offence of Theft.

1

| 104TH CONGRESS 1st Session | SENATE | TREATY DOC. 104–2 |

# TREATY WITH THE UNITED KINGDOM ON MUTUAL LEGAL ASSISTANCE ON CRIMINAL MATTERS

———

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED AT WASHINGTON ON JANUARY 6, 1994, TOGETHER WITH A RELATED EXCHANGE OF NOTES SIGNED THE SAME DATE



JANUARY 23, 1995.—Treaty was read the first time and, together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

———

U.S. GOVERNMENT PRINTING OFFICE

99–118                    WASHINGTON : 1995

# LETTER OF TRANSMITTAL

—————

THE WHITE HOUSE, *January 23, 1995.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters, signed at Washington on January 6, 1994, with a related exchange of notes signed the same date. Also transmitted for the information of the Senate is the report of the Department of State with respect to this Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of modern criminals, including members of drug cartels, "white-collar criminals," and terrorists. The Treaty is self-executing.

The Treaty provides for as broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records, and evidence; (3) the service of legal documents; (4) the location or identification of persons; (5) the execution of requests for searches and seizures; and (6) the provision of assistance in proceedings relating to the forfeiture of the proceeds of crime and the collection of fines imposed as a sentence in a criminal prosecution.

I recommend that the Senate give early and favorable consideration to the Treaty, and related exchange of notes, and give its advice and consent to ratification.

WILLIAM J. CLINTON.

# LETTER OF SUBMITTAL

---

DEPARTMENT OF STATE,
*Washington, January 6, 1995.*

THE PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (the "Treaty"), signed at Washington on January 6, 1994, together with a related exchange of notes signed on the same date. I recommend that the Treaty and the related exchange of notes be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with Argentina, the Bahamas, Canada, Italy, Mexico, Morocco, the Netherlands, Spain, Switzerland, Thailand, Turkey, the United Kingdom concerning the Cayman Islands, and Uruguay. Other similar treaties have been signed and ratified by the United States (but have not yet entered into force) with Belgium, Colombia, and Jamaica. In addition, treaties with Nigeria and Panama have been transmitted to the Senate and await Senate consideration. This Treaty contains many provisions similar to those in the other treaties.

This Treaty will enhance our ability to investigate and prosecute drug-related money laundering offenses. It is designed to be self-executing and will not require implementing legislation.

Article 1 provides for mutual assistance in "proceedings", which is defined in Article 19 to include any measure taken in connection with the investigation or prosecution of criminal offenses, including the freezing, seizure, and forfeiture of proceeds and instrumentalities of crime and the imposition of fines related to a criminal prosecution.

The Treaty does not contain a provision limiting assistance to offenses which are proscribed under the law of the Party from which assistance is requested (the "Requested Party"). As clarified in the interpretative notes that accompany the Treaty, however, the Treaty does not apply to anti-trust or competition investigation or proceedings underway at the time the Treaty was signed. This exchange of notes also provides that the Central Authorities of the Parties may, at a later date, provide assistance in such proceedings as may be agreed in writing between the Parties.

VI

Page

Article 1 further provides that assistance under the Treaty shall include: taking the testimony or statements or persons; providing documents, records, and evidence; serving documents; locating or identifying persons; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of crime and assistance in related proceedings; and such other assistance as may be agreed between the Central authorities.

Article 1 explicitly states that the Treaty does not create rights in private parties to obtain, suppress, or exclude evidence, or to impede the execution of a request.

Article 2 provides for the establishment of Central Authorities and defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or a person designated by the Attorney General. For the United Kingdom, the Central Authority is the Secretary of State for the Home Department or the Secretary's designee. The article provides that requests under the Treaty shall be made directly between the Central Authorities.

Article 3 sets forth the circumstances under which a Party may deny assistance under the Treaty, including requests related to certain military offenses, offenses of a political character, and requests relating to an offender who, if proceeded against in the Requested Party, would be entitled to be discharged on grounds of a previous acquittal or conviction. In addition, a Requested Party may also refuse assistance, if, in its view, the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy. As clarified in the interpretative notes accompanying the Treaty, the limitation based on "important public policy" grounds would include a Requested Party's policy of opposing the exercise of jurisdiction which, in its view, is extraterritorial and objectionable.

Before denying assistance, the Central Authority of the Requested State is required to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions it deems necessary. If the Requesting State accepts assistance subject to conditions, it shall comply with the conditions.

Article 4 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each case. The article specifies further information to be provided to the extent necessary and possible to assist in locating individuals and effecting particular types of assistance.

Article 5 provides that a Request Party shall take whatever steps it deems necessary to give effect to requests from the other Party. Courts in the Requested State are empowered to issue subpoenas, search warrants, or other order orders necessary to execute such requests.

Article 5 further states that requests are executed in accordance with the laws of the Requested State unless the Treaty provides otherwise. The method of execution specified in the request is to be followed to the extent that it is not incompatible with the laws and practices of the Requested Party. If the Central Authority of the

VII

Requested Party determines that execution of the request would interfere with ongoing proceedings or prejudice the safety of any person in its territory, it may postpone execution or, after consultations with the Requesting Party, impose conditions on such execution. If the Requesting Party accepts assistance subject to such conditions, it shall comply with them.

Under Article 5, the Central Authority of the Requested Party shall promptly inform its counterpart in the Requesting Party of the outcome of the execution of a request. If a request is denied, a Central Authority shall inform its counterpart of the reasons for such denial.

Article 6 apportions between the two States the costs incurred in executing a request. Generally, each State shall bear the expenses incurred within its territory of executing a request.

Article 7 establishes procedures both for ensuring the confidentiality of requests and their contents. Upon request, the Requested Party shall keep confidential any information that might indicate that a request has been made or responded to. However, if a request cannot be executed without breaching confidentiality, the Requested State must inform the Requesting State, so that the Requesting State may determine whether to withdraw the request in order to maintain confidentiality. Article 7 further obliges the Requesting Party not to use or disclose any information or evidence obtained under the treaty for purposes unrelated to the proceedings stated in the request without the prior consent of the Requested Party. In the interpretative notes, the Parties recognize that these prohibitions will not prohibit a Requesting Party from disclosing such information to the extent there is an obligation to do so under that Party's Constitution or law. This last clarification was provided to ensure that the United States and the United Kingdom authorities would be in a position to make available exculpatory information to criminal defendants.

Article 8 provides that the Requested Party may compel, if necessary, the taking of testimony or production of documents in its territory on behalf of the Requesting Party. In the event that a person whose testimony or evidence is being taken asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting Party, the testimony or evidence shall be taken and the claim made known to the Requesting Party for resolution by its authorities.

Article 8 also requires the Requested Party, upon request, to inform the Requesting Party in advance of the date and place of the taking of testimony. The Requested Party must also permit the presence of any persons specified in the request (such as the accused, counsel for the accused, or other interested person) and to permit such persons to question the person whose testimony is being taken, through a legal representative qualified to appear before the courts of the Requested Party. Finally, this article provides a mechanism for authentication of documentary evidence produced pursuant to this article and provides that no further authentication or certification shall be necessary in order for such information to be admissible in evidence in proceedings in the Requesting Party.

Article 9 requires that the Requested Party provide the Requesting Party with copies of publicly available records of government departments and agencies. The Requested Party may further pro-

VIII

vide copies of other records or information in the possession of a
government department or agency but not publicly available to the
same extent and under the same conditions as it would to its own
law enforcement or judicial authorities. The article requires official
authentication of documents furnished, using forms appended to
the Treaty and confirms their admissibility in evidence in the Re-
questing Party if so authenticated.

Article 10 provides a mechanism for a Requesting Party to invite
the voluntary appearance and testimony in its territory of a person
located in the Requested Party. In such a case, the Central Author-
ity of the Requested Party is required to invite the person to ap-
pear and promptly inform the Central Authority of the Requesting
Party of the person's response. The request may state that the Re-
questing Party will assure the person shall not be subject to service
of process or be detained or subjected to restriction of personal lib-
erty, by reason of any acts or convictions which preceded his depar-
ture from the territory of the Requested Party. This safe conduct
shall cease fifteen days after the Central Authority of the Request-
ing Party has notified its counterpart that the person's presence is
no longer required, or if the person has left the territory of the Re-
questing Party and voluntarily returns to it.

Article 11 provides for the voluntary transfer to one Party of a
person in custody in the other Party, for purposes of assistance
under the Treaty, provided that the person in question and both
Parties agree. The article establishes the express authority and the
obligation for the Requesting Party to maintain the person in cus-
tody unless otherwise authorized by the Requested Party. It fur-
ther specifies the requirements for ensuring the person's safety and
return to the Requested Party.

Article 12 provides that the Requested Party shall use its best
efforts to ascertain the location or identity of persons specified in
a request and shall promptly notify the Requesting Party of the re-
sults of its inquiries.

Under Article 13, a Requested Party shall, to the extent possible,
effect service of process of any document requested under the Trea-
ty, including subpoenas or other process requiring the appearance
of any person before any authority or tribunal in the territory of
the Requesting Party. Such service, however, does not impose an
obligation under the law of the Requested Party to comply with
such process. The article further requires that any request for the
service of a document requiring a person to appear in the territory
of the Requesting Party be transmitted a reasonable time before
the scheduled appearance. The Requested Party is required to re-
turn proof of service.

Article 14 obligates each Party to execute requests for search,
seizure, and delivery of any article to the Requesting Party if the
request includes the information justifying such action under the
laws of the Requested Party and it is carried out in accordance
with the laws of that Party. The Requested Party may refuse such
a request if it relates to conduct for which its own powers of search
and seizure would not be exercisable in a similar circumstance. The
article further provides for the authentication and certification of
evidence delivered under this article and provides that the Central

IX

Authority of the Requested Party may impose conditions on transfer to protect third party interests in the property.

Article 15 obliges the Requesting Party to return any documents or articles furnished to it under this treaty unless the Central Authority waives such return.

Article 16 obligates the Parties to assist each other in asset forfeiture proceedings. Specifically, the Parties agree to assist each other in proceedings involving the identification, tracing, freezing, seizure, or forfeiture of the proceeds and instrumentalities of crime and to assist each other in relation to proceedings involving the imposition of fines related to a criminal prosecution. Under this article, a Requested Party may transfer forfeited assets or the proceeds of their sale to the other Party to the extent permitted by the former's domestic law, upon such terms as may be agreed.

Article 17 provides that assistance and procedures provided in this Treaty shall not prevent the Parties from providing assistance to each other through the provisions of other international agreements, national laws, or any other arrangement, agreement, or practice applicable between their law enforcement agencies.

Article 18 provides that the Parties or their Central Authorities shall consult promptly at the request of either, concerning the implementation of this Treaty. Article 18 also contains novel consultative procedures to enable the Parties to have first recourse to the Treaty, with respect to any matter for which assistance could be granted under the Treaty, prior to the enforcement of a "compulsory measure" requiring an action to be performed by a person located in the territory of the other Party. The term "compulsory measure" is described with greater specificity in the interpretative notes. Under the consultative mechanisms for dealing with the enforcement of compulsory measures, if a Party is aware that its authorities are intending to take such compulsory measures, its Central Authority shall inform the other Central Authority, who may request consultations. Should a Central Authority learn that such measures may be taken in its territory, it may also request consultations. Ultimately, should consultations fail to resolve the matter, cause unreasonable delay, or jeopardize the successful completion of a proceeding, enforcement of the compulsory measure is not foreclosed. In such instance the Central Authority of the Party taking such action may give written notice to the other Central Authority of that circumstance. Article 18 finally provides for a general obligation of the parties to exercise moderation and restraint, even when the Parties' consultation obligations under this article are satisfied.

In addition to the consultative mechanism for compulsory measures described above, the interpretative notes commit the U.S. Department of Justice, on behalf of the United States Government, to take certain specified practical measures to reduce the number of instances in which a conflict of laws, policies, or national interests may arise. Specifically, the notes state that the Department of Justice shall: (1) Instruct all federal prosecutors not to seek compulsory measures, as referred to in Article 18(2) with respect to any matter for which assistance could be granted under the Treaty unless the U.S. Central Authority has concluded that the consultative mechanisms in Article 18 have been satisfied; (2) instruct all fed-

X

eral prosecutors not to enforce any compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty unless the U.S. Central Authority has concluded that the consultative mechanisms in Article 18 have been satisfied; and (3) undertake to discourage the issue of compulsory measures by other U.S. Government agencies for evidence located in the United Kingdom in any matter covered by the Treaty by advising all such agencies not to seek such process without consultation and coordination with the United States Central Authority.

Article 19 defines the term "proceedings", thus setting forth the matters for which the Parties will provide assistance under the Treaty. As noted above, the term "proceedings" means proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offenses, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition of fines related to a criminal prosecution. Article 19 further provides that the Central Authorities may at their discretion treat as proceedings such hearings before or investigations by any court, administrative agency or administrative tribunal with respect to the imposition of civil or administrative sanctions as may be agreed in writing between the Parties.

Article 20 sets forth the territorial application of the Treaty. With respect to the United Kingdom, the Treaty shall apply to England, Wales, Scotland, Northern Ireland, the Isle of Man, Channel Islands, and to any other territory for whose international relations the United Kingdom is responsible and to which this Treaty shall have been extended by agreement between the Parties.

Article 21 provides that the treaty shall be ratified and shall enter into force upon an exchange of instruments of ratification.

Article 22 provides for termination to be effective six months after written notice of termination is given by one party to the other Party.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty and related exchange of notes by the Senate as soon as possible.

Respectfully submitted,

WARREN CHRISTOPHER.

TREATY BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNMENT OF THE UNITED KINGDOM

OF GREAT BRITAIN AND NORTHERN IRELAND

ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

2

# CONTENTS

Preamble

| | | |
|---|---|---|
| Article 1 | Scope of Assistance |
| Article 2 | Central Authorities |
| Article 3 | Limitations on Assistance |
| Article 4 | Form and Contents of Requests |
| Article 5 | Execution of Requests |
| Article 6 | Costs |
| Article 7 | Confidentiality and Limitations on Use |
| Article 8 | Taking Testimony and Producing Evidence in the Territory of the Requested Party |
| Article 9 | Records of Government Agencies |
| Article 10 | Personal Appearance in the Territory of the Requesting Party |
| Article 11 | Transfer of Persons in Custody |
| Article 12 | Location or Identification of Persons |
| Article 13 | Service of Documents |
| Article 14 | Search and Seizure |
| Article 15 | Return of Documents and Articles |
| Article 16 | Assistance in Forfeiture Proceedings |
| Article 17 | Compatibility with Other Arrangements |
| Article 18 | Consultation |
| Article 19 | Definitions |
| Article 20 | Territorial Application |
| Article 21 | Ratification and Entry into Force |
| Article 22 | Termination |

3

**TREATY BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM
OF GREAT BRITAIN AND NORTHERN IRELAND
ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS**

The Government of the United States of America and The Government of the United Kingdom of Great Britain and Northern Ireland,

Desiring to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and combatting of crime through cooperation and mutual legal assistance in criminal matters,

Reaffirming their determination to enhance assistance in the fight against crime as set out in the Agreement Concerning the Investigation of Drug Trafficking Offences and the Seizure and Forfeiture of Proceeds and Instrumentalities of Drug Trafficking, done at London February 9, 1988,

Have agreed as follows:

4

- 2 -

**ARTICLE 1**

**Scope of Assistance**

1.  The Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, for the purpose of proceedings as defined in Article 19 of this Treaty.

2.  Assistance shall include:

    (a)  taking the testimony or statements of persons;

    (b)  providing documents, records, and evidence;

    (c)  serving documents;

    (d)  locating or identifying persons;

    (e)  transferring persons in custody for testimony (or other purposes);

    (f)  executing requests for searches and seizures;

    (g)  identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of crime and assistance in related proceedings; and

    (h)  such other assistance as may be agreed between Central Authorities.

3.  This Treaty is intended solely for mutual legal assistance between the Parties.  The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

5

- 3 -

## ARTICLE 2
### Central Authorities

1.   Central Authorities shall be established by both
Parties.

2.   For the United States of America, the Central Authority
shall be the Attorney General or a person or agency designated by
him.  For the United Kingdom, the Central Authority shall be the
Secretary of State for the Home Department or a person or agency
designated by him.

3.   Requests under this Treaty shall be made by the Central
Authority of the Requesting Party to the Central Authority of the
Requested Party.

4.   The Central Authorities shall communicate directly with
one another for the purposes of this Treaty.

## ARTICLE 3
### Limitations on Assistance

1.   The Central Authority of the Requested Party may refuse
assistance if:

(a)   the Requested Party is of the opinion that the
request, if granted, would impair its sovereignty,
security, or other essential interests or would be
contrary to important public policy;

6

- 4 -

    (b)  the request relates to an offender who, if proceeded against in the Requested Party for the offence for which assistance is requested, would be entitled to be discharged on the grounds of a previous acquittal or conviction; or

    (c)  the request relates to an offence that is regarded by the Requested Party as:

        (i)  an offence of a political character; or

       (ii)  an offence under military law of the Requested Party which is not also an offence under the ordinary criminal law of the Requested Party.

2.  Before denying assistance pursuant to this Article, the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting Party to consider whether assistance can be given subject to such conditions as it deems necessary.  If the Requesting Party accepts assistance subject to these conditions, it shall comply with the conditions.

### ARTICLE 4
### Form and Contents of Requests

1.  Requests shall be submitted in writing.  However, in urgent circumstances, the request may be made orally but shall be confirmed in writing within ten days thereafter.

7

- 5 -

2.  The request shall include the following:

    (a)  the name of the authority conducting the proceedings to which the request relates;

    (b)  the subject matter and nature of the proceedings for the purposes of which the request is made;

    (c)  a summary of the information giving rise to the request;

    (d)  a description of the evidence or information or other assistance sought; and

    (e)  the purpose for which the evidence or information or other assistance is sought.

3.  To the extent necessary and possible, a request shall also include:

    (a)  the identity, date of birth and location of any person from whom evidence is sought;

    (b)  the identity, date of birth and location of a person to be served, that person's relationship to the proceedings, and the manner in which the service is to be made;

    (c)  available information on the identity and whereabouts of a person to be located;

    (d)  a precise description of the place or person to be searched and of the articles to be seized;

    (e)  a description of the manner in which any testimony or statement is to be taken and recorded;

    (f)  a list of questions to be asked of a witness;

Case 3:07-mc-00046-TJC-MCR   Document 1   Filed 10/25/07   Page 37 of 62 PageID 37

8

- 6 -

(g) a description of any particular procedures to be followed in executing the request;

(h) information as to the allowances and expenses to which a person asked to appear in the territory of the Requesting Party will be entitled;

(i) any other information which may be brought to the attention of the Requested Party to facilitate its execution of the request; and

(j) requirements for confidentiality.

4. The Requested Party may ask the Requesting Party to provide any further information which appears to the Requested Party to be necessary for the purpose of executing the request.

## ARTICLE 5
### Execution of Requests

1. As empowered by this Treaty or by national law, or in accordance with its national practice, the Requested Party shall take whatever steps it deems necessary to give effect to requests received from the Requesting Party. The courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

2. When execution of the request requires judicial or administrative action, the request shall be presented to the appropriate authority by the persons appointed by the Central Authority of the Requested Party.

9

- 7 -

3.  The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party.

4.  If the Central Authority of the Requested Party determines that execution of the request would interfere with ongoing proceedings or prejudice the safety of any person in the territory of the Requested Party, the Central Authority of that Party may postpone execution, or make execution subject to conditions determined necessary after consultation with the Requesting Party.  If the Requesting Party accepts the assistance subject to the conditions, it shall comply with the conditions.

5.  The Central Authority of the Requested Party shall facilitate the participation in the execution of the request of such persons as are specified in the request.

6.  The Central Authority of the Requested Party may ask the Central Authority of the Requesting Party to provide information in such form as may be necessary to enable it to execute the request or to undertake any steps which may be necessary under the laws and practices of the Requested Party in order to give effect to the request received from the Requesting Party.

7.  The Central Authority of the Requesting Party shall inform the Central Authority of the Requested Party promptly of any circumstances which make it inappropriate to proceed with the execution of the request or which require modification of the action requested.

10

- 8 -

8.  The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request.  If the request is denied, the Central Authority of the Requested Party shall inform the Central Authority of the reasons for the denial.

### ARTICLE 6
### Costs

1.  The Requested Party shall, subject to paragraph (2) of this Article, pay all costs relating to the execution of the request, except for the fees of expert witnesses and the allowances and expenses related to the travel of persons pursuant to Articles 10 and 11 of this Treaty, which fees, allowances, and expenses shall be paid by the Requesting Party.

2.  If the Central Authority of the Requested Party notifies the Central Authority of the Requesting Party that execution of the request might require costs or other resources of an extraordinary nature, or if it otherwise requests, the Central Authorities shall consult with a view to reaching agreement on the conditions under which the request shall be executed and the manner in which costs shall be allocated.

11

- 9 -

**ARTICLE 7**

Confidentiality and Limitations on Use

1. The Requested Party shall, upon request, keep confidential any information which might indicate that a request has been made or responded to. If the request cannot be executed without breaching confidentiality, the Requested Party shall so inform the Requesting Party, which shall then determine the extent to which it wishes the request to be executed.

2. The Requesting Party shall not use or disclose any information or evidence obtained under this Treaty for any purposes other than for the proceedings stated in the request without the prior consent of the Requested Party.

3. Unless otherwise indicated by the Requested Party when executing the request, information or evidence, the contents of which have been disclosed in a public judicial or administrative hearing related to the request, may thereafter be used for any purpose.

**ARTICLE 8**

Taking Testimony and Producing Evidence
in the Territory of the Requested Party

1. A person in the territory of the Requested Party from whom evidence is requested pursuant to this Treaty may be compelled, if necessary, to appear in order to testify or produce

12

- 10 -

documents, records, or articles of evidence by subpoena or such
other method as may be permitted under the law of the Requested
Party.

2.  A person requested to testify or to produce documentary
information or articles in the territory of the Requested Party
may be compelled to do so in accordance with the requirements of
the law of the Requested Party.  If such a person asserts a claim
of immunity, incapacity or privilege under the laws of the
Requesting Party, the evidence shall nonetheless be taken and the
claim be made known to the Requesting Party for resolution by the
authorities of that Party.

3.  Upon request, the Central Authority of the Requested
Party shall furnish information in advance about the date and
place of the taking of the evidence pursuant to this Article.

4.  The Requested Party shall allow persons specified in the
request to ask questions of the person whose testimony or
evidence is being taken, through a legal representative qualified
to appear before the courts of the Requested Party.

5.  Documentary information produced pursuant to this
Article may be authenticated by the attestation of a person
competent to do so in the form indicated in Appendix A to  his
Treaty.  No further authentication or certification shall be
necessary in order for such documentary information to be
admissible in evidence in proceedings in the territory of the
Requesting Party.  Documentary information produced pursuant to

13

- 11 -

this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.

**ARTICLE 9**

**Records of Government Agencies**

1.  The Requested Party shall provide the Requesting Party with copies of publicly available records of government departments and agencies of the Requested Party.

2.  The Requested Party may provide a copy of any record or information in the possession of a government department or agency but not publicly available to the same extent and on the same conditions as to its own law enforcement or judicial authorities.  The Requested Party may refuse a request pursuant to this paragraph entirely or in part.

3.  Official records provided pursuant to this Article shall be authenticated by the Central Authority of the Requested Party in the manner indicated in Appendix B to this Treaty.  No further authentication or certification shall be necessary in order for such records to be admissible in evidence in proceedings in the territory of the Requesting Party.  Records provided pursuant to this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.

14

- 12 -

## ARTICLE 10
### Personal Appearance in the Territory of the Requesting Party

1. A request under this Treaty may seek assistance in facilitating the appearance of any person in the territory of the Requesting Party for the purpose of giving evidence before a court or of being identified in, or otherwise by his presence assisting, any proceedings.

2. The Central Authority of the Requested Party shall:

    (a) ask a person whose voluntary appearance in the territory of the Requesting Party is desired whether he agrees to appear; and

    (b) promptly inform the Central Authority of the Requesting Party of his answer.

3. If the Central Authority of the Requesting Party so indicates, a person agreeing to appear in the territory of the Requesting Party pursuant to this article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions which preceded his departure from the territory of the Requested Party.

4. The safe conduct provided for by this Article shall cease fifteen days after the Central Authority of the Requesting Party has notified the Central Authority of the Requested Party that the person's presence is no longer required, or if the

15

– 13 –

person has left the territory of the Requesting Party and voluntarily returned to it.

### ARTICLE 11
### Transfer of Persons in Custody

1.  A person in the custody of one Party whose presence in the territory of the other Party is sought for the purpose of providing assistance under this Treaty shall be transferred for that purpose if the person and both Parties consent.

2.  For the purposes of this Article:

    (a)  the Requesting Party shall be responsible for the safety of the person transferred and shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorised by the Requested Party;

    (b)  the Requesting Party shall return the person transferred to the custody of the Requested Party as soon as circumstances permit and in any event no later than the date upon which he would have been released from custody in the territory of the Requested Party, unless otherwise agreed by both Central Authorities and the person transferred; and

16

- 14 -

(c)   the Requesting Party shall not require the
      Requested Party to initiate extradition
      proceedings for the return of the person
      transferred.

### ARTICLE 12
### Location or Identification of Persons

1.   The Requested Party shall make best efforts to ascertain
the location or identity of persons specified in the request.

2.   The Central Authority of the Requested Party shall
promptly communicate the results of its inquiries to the Central
Authority of the Requesting Party.

### ARTICLE 13
### Service of Documents

1.   The Requested Party shall, as far as possible, effect
service of any document relating to or forming part of any
request for assistance properly made pursuant to this Treaty by
the Requesting Party, including any subpoena or other process
requiring the appearance of any person before any authority or
tribunal in the territory of the Requesting Party.

2.   Service of any subpoena or other process by virtue of
paragraph (1) of this Article shall not impose any obligation
under the law of the Requested Party to comply with it.

17

- 15 -

3.  The Central Authority of the Requesting Party shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting Party a reasonable time before the scheduled appearance.

4.  The Requested Party shall return a proof of service in the manner specified in the request.

## ARTICLE 14
### Search and Seizure

1.  The Requested Party shall execute a request for the search, seizure and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party and it is carried out in accordance with the laws of that Party.

2.  The Requested Party may refuse a request if it relates to conduct in respect of which powers of search and seizure would not be exercisable in the territory of the Requested Party in similar circumstances.

3.  Every official who has custody of a seized article shall certify the continuity of custody, the identity of the article and the integrity of its condition in the form indicated in Appendix C to this Treaty.  No further authentication or certification shall be necessary in order to establish these matters in proceedings in the territory of the Requesting Party. Certification under this Article may also be provided in any

- 16 -

other form or manner as may be prescribed from time to time by
either Central Authority.

4.  The Central Authority of the Requested Party may require
that the Requesting Party agree to terms and conditions which the
Requested Party may deem necessary to protect third party
interests in the item to be transferred.

### ARTICLE 15
#### Return of Documents and Articles

The Central Authority of the Requesting Party shall return
any documents or articles furnished to it in the execution of a
request under this Treaty as soon as is practicable unless the
Central Authority of the Requested Party waives the return of the
documents or articles.

### ARTICLE 16
#### Assistance in Forfeiture Proceedings

1.  The Parties shall assist each other in proceedings
involving the identification, tracing, freezing, seizure or
forfeiture of the proceeds and instrumentalities of crime and in
relation to proceedings involving the imposition of fines related
to a criminal prosecution.

2.  If the Central Authority of one Party becomes aware that
proceeds or instrumentalities are located in the territory of the

19

- 17 -

other Party and may be liable to freezing, seizure or forfeiture under the laws of that Party, it may so inform the Central Authority of the other Party.  If the Party so notified has jurisdiction, this information may be presented to its authorities for a determination whether any action is appropriate.  The said authorities shall issue their decision in accordance with the laws of their country and the Central Authority of that country shall ensure that the other Party is aware of the action taken.

3.  A Requested Party in control of forfeited proceeds or instrumentalities shall dispose of them according to its laws. Either Party may transfer forfeited assets or the proceeds of their sale to the other Party to the extent permitted by their respective laws, upon such terms as may be agreed.

ARTICLE 17

Compatibility with Other Arrangements

Assistance and procedures set forth in this Treaty shall not prevent either of the Parties from granting assistance to the other Party through the provisions of other international agreements to which it may be a party, or through the provisions of its national laws.  The Parties may also provide assistance pursuant to any arrangement, agreement, or practice which may be applicable between the law enforcement agencies of the Parties.

20

- 18 -

**ARTICLE 18**

**Consultation**

1. The Parties, or Central Authorities, shall consult promptly, at the request of either, concerning the implementation of this Treaty either generally or in relation to a particular case. Such consultation may in particular take place if, in the opinion of either Party or Central Authority, the expenses or other resources required for the implementation of this Treaty are of an extraordinary nature, or if either Party has rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty.

2. With respect to any matter for which assistance could be granted under this Treaty, neither Party shall enforce any compulsory measure requiring an action to be performed by any person located in the territory of the other Party, unless the Party proposing such enforcement has first exhausted the procedures established in paragraphs (3) and (4) of this Article.

3. If a Party is aware that its authorities are intending to take measures referred to in paragraph (2) of this Article, its Central Authority shall inform the other Central Authority, who may request consultations. If the other Party is aware of or considers that the authorities of the first Party have taken or are about to take any such measures, its Central Authority may request consultations. Thereafter, the Central Authorities shall

21

- 19 -

consult with a view to determining whether the assistance sought can be provided under this Treaty, or otherwise resolving the matter.

4.  Where consultations fail to resolve the matter, or unreasonable delay may be jeopardizing the successful completion of a proceeding, either Central Authority may give the other written notice to that effect.

5.  Unless otherwise agreed by the Parties, the obligations under paragraphs (2), (3) and (4) of this Article shall have been fulfilled 21 days after receipt of this written notice, provided that this is not less than 60 days after receipt of the request referred to in paragraph (3) above.

6.  Even in those cases in which the Parties' obligations under this Article have been fulfilled, each Party shall continue to exercise moderation and restraint.

## ARTICLE 19
### Definitions

1.  For the purposes of this Treaty, "proceedings" means proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offences, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition of fines related to a criminal prosecution.

22

- 20 -

2. In addition, the Central Authorities may at their discretion treat as proceedings for the purpose of this Treaty such hearings before or investigations by any court, administrative agency or administrative tribunal with respect to the imposition of civil or administrative sanctions as may be agreed in writing between the Parties.

ARTICLE 20

Territorial Application

This Treaty shall apply:

1. in relation to the United Kingdom:

    (a) to England and Wales, Scotland, and Northern Ireland; and

    (b) to the Isle of Man, Channel Islands and to any other territory for whose international relations the United Kingdom is responsible and to which this Treaty shall have been extended by agreement between the Parties, subject to any technical modifications agreed by the Parties and to either Party being able to terminate such extension by giving six months written notice to the other through the diplomatic channel; and

2. to the United States of America.

23

- 21 -

## ARTICLE 21

### Ratification and Entry into Force

1. This Treaty shall be ratified, and the instruments of ratification shall be exchanged at London as soon as possible.

2. This Treaty shall enter into force upon the exchange of instruments of ratification.

## ARTICLE 22

### Termination

Either Party may terminate this Treaty by means of a written notice to the other Party.  Termination shall take effect six months following the date of notification.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE in duplicate at Washington this sixth day of January, 1994.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE
UNITED KINGDOM OF GREAT BRITAIN
AND NORTHERN IRELAND:

24

## Appendix A

### CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I, _____, attest on penalty of criminal
       (Name)
punishment for false statement or false attestation that I am

employed by _____
              (Name of Business from which documents are produced)
and that my official title is _____. I further
                                  (Official Title)
state that each of the records attached hereto is the original

or a duplicate of the original of records in the custody

of _____. I
      (Name of Business from which documents are produced)
further state that:

    A)    such records were made at or near the time of the

           occurrence of the matters set forth, by (or from

           information transmitted by) a person with knowledge

           of those matters;

    B)    such records were kept in the course of a regularly

           conducted business activity;

    C)    the business activity made the records as a regular

           practice; and

    D)    if any of such records is not the original, such

           record is a duplicate of the original.


_____          _____
      (Signature)                       (Date)


Sworn to or affirmed before me, _____,
                                          (Name)
a _____, this ____ day
   (notary public, judicial officer, etc.)

of _____, 199___.

25

**Appendix B**

**ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS**

I, _____, attest on penalty of criminal
            (Name)

punishment for false statement or attestation that my position

with the Government of _____
                                        (Country)

is _____ and that in that position I am
         (Official Title)

authorized by the law of _____
                                        (Country)

to attest that the documents attached and described below are

true and accurate copies of original official records which are

recorded or filed in _____
                                (Name of Office or Agency)

which is a government office or agency of the Government of

_____.
            (Country)


    Description of Documents:




                        _____
                                    (Signature)

                        _____
                                    (Title)

                        _____
                                    (Date)

26

**Appendix C**

**ATTESTATION WITH RESPECT TO SEIZED ARTICLES**

I, _____, attest on penalty of criminal
      (Name)

punishment for false statement or attestation that my position

with the Government of _____
                  (Country)

is _____.  I received custody of the articles
    (Title)

listed below from _____ on _____, at
           (Name of Person)      (Date)

_____.  I relinquished custody of the
      (Place)

articles listed below to _____
                (Name of Person)

on _____ at _____
    (Date)       (Place)

in the same condition as when I received them (or if different,

as noted below).

    Description of Articles:

    Changes in condition while in my custody:

Official Seal       _____
                      (Signature)

                      _____
                      (Title)

                      _____
                      (Place)

                      _____
                      (Date)

27

DEPARTMENT OF STATE
WASHINGTON
January 6, 1994

Excellency:

I have the honor to acknowledge receipt of Your
Excellency's Note of today's date, which reads as follows:

"I have the honour to refer to the Treaty between
the Government of the United States of America and the
Government of the United Kingdom of Great Britain and
Northern Ireland on Mutual Legal Assistance in
Criminal Matters (the Treaty) signed today.  I have
the honour to propose that the Treaty be applied in
accordance with the provisions set out in this Note.

(a)  The term 'important public policy' in
Article 3(1)(a) would include a Requested Party's
policy of opposing the exercise of jurisdiction
which in its view is extraterritorial and
objectionable.

(b)  Article 3(1)(b) shall not affect the
availability of assistance in respect of other
participants in the offense for which assistance
is requested who would not be entitled to be
discharged on the grounds of previous acquittal
or conviction.

His Excellency
    Sir Robin W. Renwick, K.C.M.G.,
        Ambassador of the United Kingdom
            of Great Britain and Northern Ireland.

28

- 2 -

(c)  Article 7(2) shall not preclude the use
or disclosure of information to the extent that
there is an obligation to do so under the
Constitution or law of the Requesting Party in a
criminal prosecution.  Any such proposed
disclosure shall be notified by the Requesting
Party to the Requested Party in advance.

(d)  The Treaty shall not apply to
anti-trust or competition law investigations or
proceedings at this time.  The Central
Authorities may at their discretion treat as
proceedings for the purpose of this Treaty such
anti-trust or competition law matters, or
anti-trust or competition law matters generally,
as may be agreed in writing between the Parties
at a later date.

(e)  'Compulsory measures'  in Article 18,
including in the case of the United States a
grand jury subpoena, are those measures that
require an action to be performed by any person
located in the territory of the Party not issuing
the measure and that fall within the following
categories:

(i)  any measure for the production of
evidence located in the territory of the
Party not issuing the measure;

(ii)  any measure relating to assets in
the territory of the Party not issuing the
measure; or

(iii)  any measure compelling a natural
person who is in the territory of one Party
to make a personal appearance in the
territory of the other Party unless:

29

- 3 -

a)  the Party compelling the
appearance has lawfully obtained
jurisdiction over that person; or

b)  the person is a national of
the Party compelling the appearance,
without prejudice to whether a Party objects
to these compulsory measures or the
jurisdiction claimed by the other Party.
The Central Authorities may add to or amend the
categories referred to above as may be agreed in
writing between the Parties.

(f)  In the spirit of cooperation, mutual
respect, and good will, and in the interests of
facilitating the cooperative use of the Treaty
with respect to proceedings that fall within its
scope and of avoiding measures which could result
in a conflict of laws, policies, or national
interests, the United States Government shall
take several practical measures to reduce the
number of instances in which conflict may be
anticipated.  In particular, the United States
Department of Justice, on behalf of the United
States Government, shall:

(i)  instruct all federal prosecutors
not to seek compulsory measures, as referred
to in Article 18(2), with respect to any
matter for which assistance could be granted
under the Treaty unless the United States
Central Authority has concluded that the
provisions of Article 18 of the Treaty have
been satisfied;

30

- 4 -

(ii) instruct all federal prosecutors not to enforce any compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty, unless the United States Central Authority has concluded that the provisions of Article 18 have been satisfied; and

(iii) undertake to discourage the issue of compulsory measures by other United States Government agencies for evidence located in the United Kingdom in any matter covered by the Treaty by advising all such agencies not to seek such process without consultation and coordination with the United States Central Authority.

If the above proposal is acceptable to the Government of the United States of America, I have the honour to propose that this Note and Your Excellency's reply to that effect shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Treaty.

I have the honour to convey to Your Excellency the assurance of my highest consideration."

I have the further honor to inform Your Excellency that the foregoing proposals are acceptable to the Government of the United States of America and that Your Excellency's Note and this Note shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Treaty.

For The Secretary of State:

31

British Embassy
Washington D.C.

His Excellency
Warren M Christopher
Secretary of State
of the United States of America          6 January 1994

Your Excellency,

I have the honour to refer to the Treaty between the
Government of The United States of America and the Government of
the United Kingdom of Great Britain and Northern Ireland on
Mutual Legal Assistance in Criminal Matters (the Treaty) signed
today.  I have the honour to propose that the Treaty be applied
in accordance with the provisions set out in this Note.

(a) The term "important public policy" in Article 3(1)(a)
would include a Requested Party's policy of opposing the
exercise of jurisdiction which in its view is
extraterritorial and objectionable.

(b) Article 3(1)(b) shall not affect the availability of
assistance in respect of other participants in the offence
for which assistance is requested who would not be entitled
to be discharged on the grounds of previous acquittal or
conviction.

(c) Article 7(2) shall not preclude the use or disclosure of
information to the extent that there is an obligation to do
so under the Constitution or law of the Requesting Party in
a criminal prosecution.  Any such proposed disclosure shall
be notified by the Requesting Party to the Requested Party
in advance.

(d) The Treaty shall not apply to anti-trust or competition
law investigations or proceedings at this time.  The Central
Authorities may at their discretion treat as proceedings for
the purpose of this Treaty such anti-trust or competition
law matters, or anti-trust or competition law matters
generally, as may be agreed in writing between the Parties
at a later date.

(e) "Compulsory measures" in Article 18, including in the
case of the United States a grand jury subpoena, are those
measures that require an action to be performed by any
person located in the territory of the Party not issuing the
measure and that fall within the following categories:

32

(i)  any measure for the production of evidence located in the territory of the Party not issuing the measure;

(ii) any measure relating to assets in the territory of the Party not issuing the measure; or

(iii) any measure compelling a natural person who is in the territory of one Party to make a personal appearance in the territory of the other Party unless:

   a)  the Party compelling the appearance has lawfully obtained jurisdiction over that person; or

   b)  the person is a national of the Party compelling the appearance,

without prejudice to whether a Party objects to these compulsory measures or the jurisdiction claimed by the other Party.

The Central Authorities may add to or amend the categories referred to above as may be agreed in writing between the Parties.

(f) In the spirit of cooperation, mutual respect, and good will, and in the interests of facilitating the cooperative use of the Treaty with respect to proceedings that fall within its scope and of avoiding measures which could result in a conflict of laws, policies, or national interests, the United States Government shall take several practical measures to reduce the number of instances in which conflict may be anticipated.  In particular, the United States Department of Justice, on behalf of the United States Government, shall:

(i)   instruct all federal prosecutors not to seek compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty unless the United States Central Authority has concluded that the provisions of Article 18 of the Treaty have been satisfied;

(ii)  instruct all federal prosecutors not to enforce any compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty, unless the United States Central Authority has concluded that the provisions of Article 18 have been satisfied; and

(iii) undertake to discourage the issue of compulsory measures by other United States Government agencies for evidence located in the United Kingdom in any matter covered by the Treaty by advising all such agencies not to seek such process without consultation and coordination with the United States Central Authority.

33

If the above proposal is acceptable to the Government of the
United States of America, I have the honour to propose that this
Note and Your Excellency's reply to that effect shall constitute
an agreement between our two Governments, which shall enter into
force on the date of entry into force of the Treaty.

I have the honour to convey to
Your Excellency the assurance of
my highest consideration.

ROBIN W RENWICK